

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 28, 2023

**By ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

Re:   *United States v. Michael Colello*, 20 CR 613 (JSR)

Dear Judge Rakoff,

The Government respectfully submits this letter in advance of the defendant's sentencing, which is currently scheduled for December 4, 2023 at 4:00 PM.  For the reasons set forth below, the Government submits that a sentence of at least eight years' imprisonment and three years' supervised release is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing, particularly the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, including specific deterrence for this recidivist defendant, and to avoid unwarranted sentence disparities among defendants.  In addition, as discussed further below, the Government respectfully requests that the Court order forfeiture in the amount of $1,228,700 and restitution in the amount of $1,906,000.

## Background

On November 17, 2020, a grand jury sitting in the Southern District of New York voted an indictment charging Defendant Michael Colello (*i.e.*, the defendant) and Co-Defendant Charles Sayegh with one count of participating in a conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 ("Count One"), and one count of committing aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2 ("Count Two").

The charges arose from a scheme to defraud Petron Energy, Inc. ("Petron"), a small oil and gas company based in Dallas, Texas, of funds that Petron and certain of its investors directly supplied to bank accounts that the defendant and others of his co-conspirators or agents controlled. (*See* Presentence Investigation Report dated November 17, 2023 (the "PSR") at ¶¶ 11-29).[1]

---

[1] The Government generally relies upon the PSR—which draws from information that is contained in the "speaking indictment," the record of the trial before this Court from May 22, 2023 to

On November 18, 2020, both Colello and Sayegh were arrested, presented, and released on bail. On February 24, 2023, this Court principally sentenced Sayegh to a term of imprisonment of one year and one day, to be followed by one year of supervised release.

On May 26, 2023, a jury convicted the defendant of Count One and Count Two following a one-week trial before this Court.

## Applicable Law

Under the current sentencing regime stemming from *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, once a district court calculates the advisory range under the United States Sentencing Guidelines, the real work of imposing a just sentence begins and ends with 18 U.S.C. § 3553 as applied through the sound judgment and experience of the district court.

Under Section 3553(a), a district court must consider seven factors: (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the applicable range under the United States Sentencing Guidelines, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

In Count Two, the defendant stands convicted of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2. The "aggravated identity theft statute provides that, 'in determining any term of imprisonment to be imposed for the [underlying] felony'—here, Count One—the [Court] 'shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account' the two-year mandatory consecutive sentence for the aggravated identity theft offense." *United States v. Mends*, 412 F. App'x 370, 375 (2d Cir. 2011) (quoting 18 U.S.C. § 1028A(b)(3)); *see also United States v. Omole*, 523 F.3d 691, 699 (7th Cir. 2007) (holding that had the sentencing judge "even slightly factored" Section 1028A's

---

May 26, 2023, and information that the Government otherwise supplied—for its description of the offense conduct that occurred between in or about 2015 and 2016.

mandatory two-year sentence into his decision to lean toward a lighter sentence on the predicate felony counts, "he would have violated 18 U.S.C. § 1028A(b)(3)"). *See also* 08/03/2023 Sentencing Tr. at 40, *United States v. Williams,* 21 CR 603 (VEC) (S.D.N.Y. Aug. 3, 2023) (Dkt. 1017) ("I note that congress made it clear when it passed the aggravated identity theft statute that the sentencing court is not to reduce any sentence that would otherwise be imposed because there will be an additional two-year sentence on top because of the aggravated identity theft charge, and so I have complied with that directive.").

## Guidelines

The Government respectfully submits that the applicable range under the United States Sentencing Guidelines is 102 to 121 months' imprisonment, as detailed in the PSR. (*See* PSR at ¶¶ 39-71, 120). The United States Probation Office for the Southern District of New York ("Probation") agrees with the Government's Guidelines calculation.

## Sentence

No fewer than six aggravating factors inform the Government's recommendation that the Court impose a sentence of at least eight years' imprisonment and three years' supervised release.

*First*, the brazenness of the defendant's scheme to defraud—a scheme in which he repeatedly peddled forged documents to unwitting victims—was laid bare at trial.

As this Court saw at trial, fake documents abounded. First, there were the fake surety bonds that the defendant used to induce investors in Petron to put forward the funds purportedly necessary to secure a (similarly forged) standby letter of credit ("SBLC"). When Petron and at least one of its investors raised questions about the first surety bond—having come to suspect that its fabricated signatory did not, in fact, work at the insurance broker that had purportedly issued the surety bond—the defendant responded with an even bolder lie. He provided a second surety bond purportedly signed by a different signatory but, this time, co-opted the name of a *real* insurance broker, Mr. Bassel Haffar. This Court heard from Mr. Haffar at trial, including about how the signature at the bottom of that second surety bond was not his.

Then came the SBLC documents, in which the defendant time, after time, after time, forged papers that in the first round secured him one-million dollars and that in the second and third round were intended to string along his victims, lulling them into not pursuing justice against him for over a year from the start of the instant offense conduct. Again, with respect to one of these SBLCs, the defendant used the names of multiple, real bank employees to pass off his forgeries. And one of them, Ms. Madelaine Licayan, travelled from the Philippines to testify before this Court at trial about how her name had been hijacked for the defendant's fraudulent scheme and financial gain.

It was not, of course, only these several forgeries that demonstrate the defendant's brazenness. To defraud his victims, he created not one but two personae (*i.e.*, "Mike Greene" and "Stan Greene") and made fantastic claims about his non-existent career in finance, including his purported stint as the Chief Operating Officer of Barclays Bank. These claims, too, were dismantled at trial. The Court heard from witness after witness about the layer of lies they had untangled, ultimately realizing they had been duped.

These lies must be met with consequences. The trust that is essential in every aspect of our nation's public life but particularly so between counterparties to financial transactions cannot long survive, with terrible collateral costs for all of us, where the threat of outright lies and forgeries is not confronted and faces no significant consequence in the criminal justice system.

*Second*, the defendant intended his brazen fraudulent scheme—given its galling directness that bordered upon outright theft—to victimize only the least sophisticated participants in the financial marketplace. Anyone with experience of how surety bonds and SBLCs work, indeed any significant experience in corporate or project finance, would have never been tricked, let alone lulled for over a year, into sending the defendant any amount of money. The defendant knew this, and he made sure to select unsophisticated victims who would be none the wiser.

*Third*, to protect himself and perpetuate his fraud, the defendant was prepared to implicate and compromise the reputation of a whole array of third parties. These third parties included the largest domestic and foreign banks and a top-shelf insurer of all manner of risks. By necessity, the defendant's actions also called into question and tarnished the reputations of individual employees working with and for those systemically significant institutions. The testimony of Mr. Haffar and Ms. Licayan regarding the professional damage and personal harm they suffered by virtue of the defendant's fraud left no doubt as to the defendant's intent to use the good names of other people to carry out his scheme.

*Fourth*, although the actual loss in this case of just under $2,000,000 is not insignificant, the losses that the defendant was prepared to create for possible lenders and other financial intermediaries were much greater. Consider that the defendant did not set out to be caught in his fraudulent scheme. And the way that he would have escaped any consequences was for his fake SBLCs actually to fool someone, a bank or non-bank financial institution or even a consortium of individuals, into lending millions of dollars to Petron against the worthless paper he mashed together as alleged collateral. The defendant had no reservations, for example, about attempting to induce Qurad to issue a loan for tens of millions of dollars, all on the promises of forged documents.

*Fifth*, this fraudulent scheme is no outlier but, rather, just the latest in a substantial body of fraudulent conduct that extends over a substantial part of the defendant's adult life. As the PSR's review of the defendant's prior federal case in the United States District Court for the Central District of California makes clear, the defendant has been swindling people through fake documents for *decades* extending back into the 1990s. (*See* PSR at ¶¶ 53-69). And even his instant offense conduct is not the product of one or two poor exercises of judgment or surrender to temptation on a handful of occasions. *Rather*, the instant offense conduct spans an extended time period. Further, evidence identified from the defendant's personal email accounts and introduced at trial—of continuous fake documents listing a variety of other presumptive victims or at the very least intended victims—similarly shows how the defendant's instant offense conduct has continued up to the present. (*See* GX 501, 510, 520, 530, 540 (certain records obtained from Google, Yahoo, and CSC)).

*Finally*, even in the wake of the defendant's conviction, he remains a defiant figure, unwilling to accept any degree of responsibility before the Court. Indeed, the defendant is actively thwarting the ability of the Court to assess different aspects of what is an appropriate sentence,

particularly with respect to his financial ability to pay. (*See* PSR at ¶¶ 115-118). In addition to heightening what is an appropriate sentence to punish the defendant, his lack of any contrition bears powerfully on what is necessary to deter him specifically from simply returning to the instant offense conduct whenever he is at liberty,

These aggravating factors make clear to the Government that a substantial incarceratory sentence—at least eight years' imprisonment and a term of supervised release of three years—is necessary to achieve the appropriate punishment of the defendant and the deterrence of both the defendant and others. Specifically, the Government seeks the requested sentence with similarly situated white-collar criminals in mind, particularly within the financial services industry, who are perhaps uniquely amenable to general deterrence, given their relative sophistication and experience conducting themselves based upon marketplace forces. In addition, as maintained at all relevant times, the Government views the defendant as the most culpable participant in the scheme to defraud on a material and widespread basis, which compounded by his criminal history, the extent of his instant offense conduct, and his lack of any acceptance of responsibility, makes a sentence of eight times the length that his codefendant received earlier this year entirely appropriate.[2]

## Forfeiture

As stated above, noted in the PSR (*see* PSR ¶ 32), and proven at trial (*see, e.g.*, GX 1001, 1002, 1003, and 1005 summary charts showing the flow of payments from victims to the defendant and his co-conspirators)), from his perpetration of the overall scheme to defraud, the defendant received (i) $3,725 tied to the first surety bond, (ii) $224,975 tied to the second surety bond, and (iii) $1,000,000 tied to the SBLC—an amount, notwithstanding its eventual destination, that a victim wired into a bank account of the defendant's agent at the defendant's direction—yielding a total of $1,228,700, which the Government accordingly requests the Court to order as forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), as set out in the enclosed proposed order.

## Restitution

Pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), the Court shall order a defendant to pay restitution to any victim in the amount of the value of the property that the victim lost through any offense committed by fraud or deceit, which encompasses conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. *See* 18 U.S.C. §§ 3663A(c)(1)(A)(ii), 3664; *United States v. Sensmeier*, 361 F.3d 982, 987–88 (7th Cir. 2004). Where, as here, the

---

[2] To be certain, the Government agrees with much of the rationale that Probation sets out to support its recommendation of a sentence of six years' imprisonment. (*See* PSR at pp. 34-35). Nonetheless, a finding that six years' imprisonment is an appropriate and just sentence under the factors of Section 3553(a) is an acknowledgment of the fact, pursuant to Section 1028A, that a sentence of eight years' imprisonment is appropriate. Pursuant to Section 1028A(b)(3), rather than subtracting two years from a sentence of six years' imprisonment to identify the appropriate sentence under Count One, Probation is required, like the Court, *to add* two years to the sentence that it otherwise believes is appropriate.

defendant is convicted of participating in a conspiracy, "the defendant's criminal conduct in the course of the . . . conspiracy" is the basis for restitution. 18 U.S.C. § 3663A(a)(2). As the Second Circuit has held, however, this statutory language does not limit restitution to "losses caused by the actions of the defendant" during the conspiracy, but also embraces losses flowing from the reasonably foreseeable "actions of that defendant's co-conspirators." *United States v. Boyd*, 222 F.3d 47, 50-51 (2d Cir. 2000).

Here, the defendant orchestrated the fraudulent offer of wholly fabricated surety bonds to Petron, for which the defendant knew that investors of Petron paid $606,000. And from there, having secured the confidence of the principals and investors of Petron, the defendant continued to direct the overall fraudulent scheme and its next step of the fake SBLC, the financial product that the investments secured through the fabricated surety bonds was purported to obtain. The fake SBLC, as the record makes clear, contemplated Sayegh's receipt of a commission of $300,000 and a premium cost of $1,000,000, the latter of which an investor victim wired, at the defendant's direction, to the escrow account of the defendant's attorney, *the defendant's agent*, which from there was distributed to various bank accounts whose beneficial owners, including the defendant, are both known and unknown, as in the case of the foreign bank accounts based in Singapore.

Accordingly, the Government respectfully requests the Court to order restitution in the amount of $1,906,000 in the manner and to the victims specified in the enclosed proposed order, which contemplates joint and several liability for the defendant with his co-defendant. The enclosed proposed order also contemplates prioritization of payments to the individual investors of Petron over Petron itself given the "type and amount of each victim's loss and accounting for the economic circumstances of each victim" pursuant to 18 U.S.C. § 3664(i). In this case, such prioritization is appropriate because the individual investors are single, real persons, comparatively less able to weather hundreds of thousands of dollars in losses attributable to fraud than a corporate entity such as Petron. As to the schedule of payments, the Government proposes the same conditions as Probation, with the exception that the Government introduces a provision to ensure a minimum monthly restitution payment upon the defendant's release from imprisonment. As stated above, the defendant has chosen to conceal entirely his present financial condition from Probation (*see* PSR at ¶¶ 115-118), which given the offense conduct and the defendant's continued unwillingness to accept any responsibility for that offense conduct, the Government respectfully submits reflects his continued efforts to conceal his ability to pay the substantial financial costs of that offense conduct. Because there is every reason to believe that the defendant will choose to pursue employment upon his eventual release that will secure him a further salary, the Government views the imposition of a minimum payment amount of $1,000 per month as consistent with the interest of justice and the ability of the defendant to pay restitution, both from his concealed assets and income from future employment.

**Conclusion**

For the reasons set out above, the Government respectfully requests that the Court sentence the defendant to a term of imprisonment of at least eight years' imprisonment and a term of supervised release of three years and order forfeiture in the amount of $1,228,700 and restitution in the amount of $1,906,000, for which the Government encloses proposed orders here.

Respectfully,

DAMIAN WILLIAMS
United States Attorney

By: *Thomas John Wright*
Benjamin M. Burkett
Brandon C. Thompson
Thomas John Wright
Assistant United States Attorney
(212) 637-2455 / 2444 / 2295

Enclosures

cc: Joseph Curtis Edmondson (Counsel to Defendant Michael Colello) (by ECF)